Dessa Jane BURRELL, Respondent,

v.

MAYFAIR–LENNOX HOTELS, INC., a Corporation, Appellant.

No. 54081.

Supreme Court of Missouri, Division No. 1.

June 9, 1969.

Daniel P. Reardon, James K. Pendleton, St. Louis, for respondent.

Joseph H. Mueller, J. C. Jaeckel, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant.

———◆———

HENRY I. EAGER, Special Commissioner.

This is a suit for personal injuries sustained by plaintiff in a fall down the steps leading from the lobby of the Lennox Hotel to the Rathskeller. Plaintiff was an airline hostess and, at the time of her injury, was a paying guest in the hotel, which is owned by the defendant. The jury found for plaintiff and assessed her damages at $23,000. The trial court, on motion for a new trial, required a remittitur of $5000 to which plaintiff consented. The appeal is here from a judgment of $18,000.

Plaintiff's amended petition alleged that her fall was caused by defendant's negligence in allowing the top step of the stairway to become "loose, unstable, worn down and hollowed out under the carpeting of the lobby * * *," and also that the area was poorly lighted; other allegations of negligence are not material now. It was further alleged that defendant knew or should have known of the dangerous and defective conditions. The steps were conceded to be of marble (possibly the top step was terrazzo) but the top step was covered out to its edge by a carpet. Defendant denied the substantive allegations and pleaded general contributory negligence. The negligence hypothesized in plaintiff's only verdict-directing instruction, No. 2, was that "there was a depression in the surface of the floor which was covered by carpeting and as a result the floor was not reasonably safe for guests * * *." Defendant conversed the existence of a depression.

The injury in question occurred on January 27, 1963; the unusual delay seems to be due to the fact that suit was not filed until April 20, 1966. At the time of trial plaintiff was 35 years of age and unmarried; she lived in Kansas City. She was due to go out on another flight at 5:30 on the afternoon of the accident, and she and her hostess partner, Jean Cizaldo, went to the lobby to get something to eat at about 2:30 p. m. They found the lunchroom closed (the date was on Sunday) and were directed to the Rathskeller. Plaintiff's companion was a little ahead and to the right as they approached the head of the stairs. There were about eight steps down to a landing, with more downward from there. Plaintiff's further testimony was in substance as follows: that the lighting was poor but she could see the floor; that the lobby was carpeted with a navy blue carpet

with a "red blush" which extended to the edge of the top step; that this carpet was pulled over "a worn, cupped-out area"; that her left foot went down "in that cupped-out area and threw me off balance, and I went down the stairs"; that she struck the edge of a step on the extreme lower part of her back or her buttocks; that she was wearing "mid-heel" shoes, presumably medium heels; that the back of her dress felt wet and gritty after the fall; that the area under the carpeting where she fell was "cupped-out" (repeated); that she looked at the top step when she came up after her fall, again that evening when she came back from Barnes Hospital, and still later on the next Tuesday with her supervisor; that she could "feel it by pushing down on it with my foot"; that it was the "cupped-out area" which caused her accident; that she saw no abrasive strips on the steps; that her foot slipped on the lobby level, but her first impact was at about the second step down, and she "bounced" on down further; that she felt the cupped-out area at "about a foot" back from the edge of the top step, and her foot went down; that later she *saw* a depression, and she could "push down on it"; on the next Tuesday she saw the depression again. Plaintiff had been in the hotel 3 or 4 times previously but in the Rathskeller only once, at which time she entered and left from the street door. She testified that at the time of her fall neither the chandelier in the lobby nor the light on the landing of the stairs was burning.

Plaintiff was taken promptly to Barnes Hospital where she was examined and X-rays taken; she returned to the hotel about 8:00 p. m. A prescription was given to her and she was told to get off her feet, take the medicine and aspirin and take hot baths. On Tuesday, January 29, she went to the Sutter Clinic (the hotel doctors) because, she said, she had to have a "release" before she could leave. More X-rays were taken there. Late on Tuesday she returned to Kansas City with her supervisor. There she contacted her personal physician,

Dr. Florence MacInnis, who put her in St. Mary's Hospital; she stayed there two weeks, attended by Dr. MacInnis and an orthopedist, Dr. Maurice F. Perll. Dr. Perll testified by deposition. She went both to Dr. MacInnis and to Dr. Perll on various occasions after she left the hospital; Dr. Perll last saw her in March, 1964. She was also attended by: Dr. Lowry, a gynecologist; Dr. McClanahan, a general practitioner; Dr. Ira Smith, a urologist; Dr. Sherrer, a proctologist and Dr. Rockwell, a gynecologist. She did not resume work until July 17, 1963 and was off about four days in January 1964; she testified that, although she had sufficient seniority, she could not thereafter "bid" on certain runs which she preferred because she could not stand the extended effort required.

Plaintiff's primary injury was to her coccyx, the extreme end of the spinal column. She testified that when she fell she was in much pain; after seeing the doctors she took hot baths and medicine, and tried to stay off her feet; she had difficulty with her urination and also her bowel movements; she was placed on a soft-food diet by her doctors. Various X-rays were taken; she was given medicine for pain; she continued to see one or more doctors "nearly every month until 1966, some of which was for her "bladder problem." The medical evidence for plaintiff was generally as follows: that she had sustained an injury to the sacrococcygeal area, as disclosed by physical examination and X-rays and that her condition was caused by the fall; that plaintiff complained of pain in the "low back and tailbone" area with some pain radiating into the right hip; that standing or sitting for a long time aggravated the pain, and that it increased with weather changes and before her menses; that standing for any length of time caused a "bearing down" feeling at and below the low back, and prolonged sitting bothered her and her legs got numb (this as late as October 1967). Such evidence further was: that there was tenderness in the areas involved, and that the di-

agnosis was "chronic coccygodynia (painful coccyx) resulting from the fall of January 27, 1963"; that the coccyx is very close to the rectum and that only "conservative" treatment can be given; that some type of girdle might be of some help; that pain was elicited on deep palpation in the lower lumbar and sacral regions as late as October 1964; Dr. Perll rated plaintiff's permanent disability as 5–7% of the body as a whole. Plaintiff's other medical witness found a "healed" fracture line in the coccyx in an X-ray taken in October 1967; Dr. Perll found no fracture in X-rays taken in February 1963; there was some evidence that such a fracture might not show up in X-rays until after healing had started. There was also testimony of deformity of the coccyx, and of the very considerable risk of an operation in that area. One doctor included "lumbosacral strain, recurrent" in his diagnosis, caused by the trauma. That doctor explained that the conditions found were consistent with plaintiff's complaints including those already related and also including,—sitting on a hard chair, ascending or descending stairs, and discomfort in bowel movements. Plaintiff's medical evidence fairly showed the permanency of her conditions which had continued for more than five years at trial time. Plaintiff also testified: that her complaints at trial time were substantially the same as in 1963 as, that she could not sit for long periods, that her legs got numb and it felt as though she was "sitting in ice water," and that she could not stand for more than 10 or 15 minutes without a feeling of "pressure bearing down"; that she could not bowl or dance, and that she is bothered in driving a car. Plaintiff bought and used an orthopedic mattress and wears a firm, strong girdle.

It was more or less conceded that plaintiff had lost approximately $3000 in wages and sick leave time. Apparently her hospital and medical bills were paid by her employer or by insurance. During her testimony the court sustained objections to all proffered evidence concerning her bladder troubles and menstruation, and plaintiff's counsel seemingly made no serious effort to connect these up with her fall. Evidence did remain as to her difficulty in urination.

The lay testimony for defendant was generally as follows: that a new carpet was installed in the hotel lobby, from wall to wall, in July of 1962; that this was laid over rubber padding and on a terrazzo floor, but the witness assumed that the top step of the stairway in question was of marble, like the other steps; the assistant manager of the hotel testified that plaintiff stated, right after the fall, that she "just tripped at the top step and fell down"; he testified also, that there was no worn spot in the carpet and that he found no unevenness or worn spot under the carpet. We note here that no witness pretended that anyone had removed the carpet and examined the floor under it. Five photographs of the stairway were offered and received; three of these showed the stairway and the top step with a distinct pattern or design in the carpeting on the top step, and abrasive treads on the other steps; one color photograph showed the lobby generally, looking toward the stairs with the same green and patterned carpet. The four black and white photographs were *marked* as taken in March, 1963, but no witness testified to the time of the taking. Plaintiff denied that either the patterned green carpet or the abrasive strips were on the steps when she fell, but we do not consider that question as particularly material.

Defendant's medical witness, who had examined the plaintiff and taken X-rays about 6 months prior to the trial, testified that plaintiff complained of soreness in the lumbosacral and sacrococcygeal regions on pressure but that he found no muscle spasm; that she also complained of soreness on forward bending and in straight-leg raising, and of occasional soreness in her right leg. That the X-rays showed no fracture of the coccyx; that he found nothing which, in his opinion, would pre-

vent her from performing her work; he further testified that if a condition of coccygodynia had been present for 5 years he would say that it was probably permanent.

As we have already stated the case was submitted on plaintiff's Instruction No. 2, which we quote here, in view of the attacks made upon it:

"INSTRUCTION NO. 2.

"Your verdict must be for the plaintiff if you believe:

"First, there was a depression in the surface of the floor which was covered by carpeting and as a result the floor was not reasonably safe for guests, and

"Second, plaintiff did not know and by using ordinary care could not have known of this condition, and

"Third, defendant knew or by using ordinary care should have known of this condition, and

"Fourth, defendant failed to use ordinary care to remove it or warn of it, and

"Fifth, as a direct result of such failure plaintiff was injured."

The points made here by defendant are in substance as follows: (1) That plaintiff did not make a submissible case because the evidence of a "cupped-out" area in the floor, relied upon to constitute a negligent defect, was a rank conclusion, without probative value. (2) That the court erred in not granting a mistrial because of a statement of plaintiff's counsel, which will be discussed later. (3) That Instruction 2 was erroneous because: (a) it was broader than plaintiff's petition; (b) there was no evidence of probative value to support the hypothesis of a depression in the floor, and no such depression was sufficiently located in the evidence; (c) that the use of the word "should" in paragraph "Third" was a deviation from MAI and prejudicial. (4) And finally, that the verdict and judgment, even after remittitur, are excessive. Plaintiff's counsel have controverted these points, with the additional suggestion that one has not been properly preserved.

We consider first the sufficiency of the evidence; in so doing we shall not repeat all of plaintiff's testimony as heretofore related in considerable detail. It is only necessary that there be substantial evidence of a defect from which the jury may draw an inference of negligence. Plaintiff testified: that as she stepped her foot went down into a "cupped-out" place in the floor which caused her to fall, and that she examined the place on three occasions; that this place was at a point about a foot back from the edge of the top step; that she saw the depression and also could feel it by pressing down on it with her foot. It is true that she did not measure the depression nor did she take up the carpet. Her testimony constituted a sufficient factual basis for a fair inference that there *was* a depression in the floor; she saw nothing wrong with the carpet at any time, and the argument that the depression may have been in the padding or the carpet (which on defendant's evidence had recently been laid) requires considerably more speculation than does plaintiff's theory. Her testimony as to the location was sufficiently definite; suffice it to say that, on her testimony, the depression was close enough to the edge of the top step to make any existing defect dangerous. So far as "dimensions" are concerned, and argued, it was sufficient to show that the depression was large enough for her foot to go into it, and deep enough to cause her to lose her balance. Some of defendant's arguments on this point are highly technical. The jury could have disbelieved plaintiff's evidence entirely as to the existence of any depression, but her testimony that there *was* one, that she saw it and felt it, that it was large enough for her foot to go into, and deep enough to throw her "off balance," was substantial evidence sufficient to make a submissible case.

Defendant's cited cases are inapplicable in their facts. In Akers v. Lever Bros., Mo., 432 S.W.2d 200, the sole claim of

negligence was in supposedly allowing a detergent powder to collect on the floor of an elevator, making it slick. Plaintiff and his witness testified that they did *not* detect any such substance on the floor, thus negativing plaintiff's very claim of negligence. A verdict was directed for the defendant. Other cases, such as Gibson v. Newhouse, et al., Mo., 402 S.W.2d 324, Linneman v. Freese, Mo., 362 S.W.2d 585, Brophy v. Clisaris, Mo.App., 368 S.W.2d 553, Smith v. Thompson, Mo.App., 258 S.W.2d 278, and Luettecke v. City of St. Louis, 346 Mo. 168, 140 S.W.2d 45, merely reiterate the proposition, generally recognized, that a plaintiff's verdict must not rest upon speculation or conjecture. We hold that this verdict does not do so. The case of Lindquist v. S. S. Kresge Co., 345 Mo. 849, 136 S.W.2d 303, holds that a plaintiff's evidence that the light was "dim" is a mere conclusion and to some extent the holding in Smith v. Thompson, supra, is similar. Plaintiff's evidence here went further, if it be material. However, in the present case no issue of lighting was submitted to the jury, and no amount of light could have permitted plaintiff to see a depression *under* the carpet.

Since the defendant, through its employed agents, installed the carpet and thus actively covered up the claimed defect, no notice to defendant of the defective condition was required. Ward v. Temple Stephens, Mo., 418 S.W.2d 935. Other cases cited by defendant involve alleged defects which were open to view, and are neither controlling nor persuasive on our facts. The Missouri courts have held on several occasions that the existence of comparatively slight defects on stairways in stores (or other places offering services to the public), constitute conditions from which a jury may infer negligence. Haverkost v. Sears, Roebuck & Co., Mo.App., 193 S.W.2d 357; Lewis v. National Bellas Hess, Inc., Mo.App., 152 S.W.2d 674; Stewart v. George B. Peck Co., 234 Mo. App. 864, 135 S.W.2d 405. And see generally, as to steps, Wattels v. Marre, Mo., 303 S.W.2d 9, 66 A.L.R.2d 433, Bowyer v.

Te-Co, Inc., Mo., 310 S.W.2d 892. The contention that no submissible case was made is denied.

The next point concerns the denial of a motion for a mistrial. When defendant's former assistant manager Martin was on the stand he testified on cross-examination that the steps were marble. Counsel for plaintiff then asked him, "How long would you say it takes marble to wear a depression in from normal wear and tear?" Defense counsel objected that it had not been shown that the witness was qualifed to answer. The court said: "It will be sustained. That is not the question anyway, really." Counsel for plaintiff then said: "Are you willing to admit that he is?" At this point defense counsel objected and asked for a mistrial. The motion was overruled, but the jury was specifically instructed to disregard the matter. Counsel asserts here that the remark, or any similar request for an admission in the presence of the jury, was highly improper in that it placed the defendant in an unfavorable light before the jury. Ordinarily it is not proper to request admissions of counsel in the presence of the jury. The effect of the error, if it be error, depends entirely upon the nature of the subject matter and the creation of prejudice. The only Missouri case cited by defendant which concerns the point, Wilkerson v. Mo. Pac. R., Mo.App., 69 S.W.2d 299, involved a request made of defendant that it admit that its engine and train caused the death of plaintiff's husband, coupled with the remark that "You admitted it at the last trial." There, however, defendant did not ask for a mistrial, and the only meaning of the case, so far as we are concerned, is that the court disapproved of the conduct. Olian v. Olian, 332 Mo. 689, 59 S.W.2d 673 is cited; it merely held that a reversal was necessary for the improper injection of the question of liability insurance into the evidence.

The request made here was improper, and indeed somewhat inane; it involved nothing of significance; for the question

of notice was not an integral part of plaintiff's case. We fail to see how the ruling could possibly have been prejudicial and we hold that it was not. In fact the request itself concerned an essentially immaterial matter. And certainly the action of the court was well within its universally recognized discretion in such matters. Hartford Acc. & Indem. Co. v. List, Mo. App., 424 S.W.2d 761; Bine v. Sterling Drug, Inc., Mo., 422 S.W.2d 623; McGinley v. St. L. P. S. Co., Mo., 239 S.W.2d 321. McGinley, supra, involved a situation somewhat analagous to ours, where plaintiff's counsel asked defendant's counsel in the presence of the jury to let him see the statement which a witness had given to defendant. The court instructed the jury to disregard the request but a motion for a mistrial was denied; this ruling was held not to be erroneous. The point thus made here is of no real substance.

Instruction No. 2, as given, has already been quoted. The objection that there was no evidence of probative value to justify the hypothesis of a "depression in the surface of the floor" has already been covered; if, as we have held, there was substantial evidence to make an issue on this question then, of course, there was sufficient evidence to support the hypothesis in the instruction. The same is true of the contention also made that the evidence did not sufficiently show the location of the depression.

■ The point is also made that, in submitting a failure "to remove it (the depression) *or warn of it * * *"* the instruction was broader than the plaintiff's petition, and therefore erroneous under the rulings of many cases. (The contention involves the underscored words.) Defendant made no objections to this instruction when it was offered, and, although it assigned error in this instruction in other respects in its motion for a new trial, it did not assign this reason or any reason even approaching it. Recognizing that our Rules require one or the other, Rule 79.03, defendant says that we should consider this

contention as a "Plain Error" under Rule 79.04. We cannot conceive that any manifest injustice resulted to the defendant because of the inclusion of the element of a failure to warn in the instruction. Assuming, as the jury found, the existence of such a depression in the floor, there was not even an intimation that defendant had warned or attempted to warn the plaintiff or anyone else of it. We decline to grant relief here under Rule 79.04. We find, as did the court en banc in State v. Patterson, Mo., decided May 12, 1969, 443 S.W.2d 104, that this instruction did not result "in manifest injustice or miscarriage of justice." The civil and criminal rules on this subject are the same, and the principles applicable are identical. The contention is denied.

■ The last attack on the instruction is that it contained in its paragraph "Third" the wording that "defendant knew or by using ordinary care should have known of this condition," whereas the word "should" properly should have been "could." Defendant arrives at this conclusion by saying that the instruction is a modification of MAI 22.03 where the word "could" is used, and that this constitutes an unwarranted deviation. The instruction as given contained no MAI marking; it probably comes closer to MAI 22.03 than to any other, although that instruction was written primarily to submit negligence in permitting a foreign substance to be and remain upon the floor of a store or public place. MAI Instruction 22.02 (hazardous condition close to a publicway), 22.04 (crack or hole in a sidewalk) and 22.05 (hole in a stairway), all use the hypothesis that "defendant knew or * * * *should* have known" of the condition. No explanation is given under Instruction 22.03 for the different wording, but we assume that the Committee on Instructions, with its customary preciseness and thoroughness, must have had some reason in mind. The insertion of paragraph "Second" in the present instruction would seem to indicate that plaintiff was seeking to follow MAI 22.03.

Rule 70.01(c) provides that when an applicable MAI Instruction is not used the violation shall constitute error, "its prejudicial effect to be judicially determined." Thus, assuming that this was a deviation from MAI 22.03, we must determine whether the change of the word was prejudicial. We state at the outset that we have no intention of departing from the strict requirements of compliance with MAI which we have announced in such cases as Brown v. St. L. P. S. Co., Mo., 421 S.W.2d 255; Cash v. Bolle, Mo., 423 S.W.2d 743; Gousetis v. Bange, Mo., 425 S.W.2d 91; Koehler v. Schott, Mo.App., 426 S.W.2d 677; Hunter v. Norton, Mo., 412 S.W.2d 163; Aubuchon v. LaPlant, Mo., 435 S.W.2d 648; Higgins v. Gosney, Mo., 435 S.W.2d 653; Strickland v. Barker, Mo., 436 S.W.2d 37; Murphy v. Land, Mo., 420 S.W.2d 505; and Motsinger v. Queen City Casket Co., Mo., 408 S.W.2d 857. We recognize also that the burden is upon the proponent of the instruction to demonstrate nonprejudice. At times, however, as here, the question must be determined from the record itself without any specific "demonstration" by a party.

In the briefs both parties rely largely upon definitions, both from dictionaries and cases. We refrain from quoting or discussing these specifically. In ordinary parlance the word "should" imports an idea of *obligation*; it is the past tense of "shall" which implies "owes, ought to, must" (Webster's 3rd Internat. Dict.). Defendant's counsel seem to recognize this meaning. They further concede that "could" denotes mere "capability" and is often used as meaning "might." The dictionary generally confirms the meaning as denoting a mere *ability* to do or make. Counsel further argue that the use of "should" thus imposed a *greater* burden upon the defendant. We wholly fail to follow that argument. The instruction, as we see it, required the plaintiff to demonstrate to the jury by its evidence that defendant was *obligated* to know of the defective condition, and not merely to demonstrate that it would have been possible

(or within its ability) to do so. Thus, in the common-sense meaning of the language used, the plaintiff and not the defendant bore a greater burden from the deviation. It seems possible that defendant thinks that the instruction *tells* the jury that defendant was obligated to know of the defect. Such is not true. It simply told the jury that *before* it could find for the plaintiff *it must find* that, under the circumstances, defendant was obligated to know of it. Our view as to where the additional burden was cast seems to be confirmed in the case of Thompson v. Quincy, O. & K. C. R. Co., Mo., 18 S.W.2d 401.

■ We hesitate to approve of any deviation from MAI Instructions, but we assume that in the ordinary course we must reach a point at some time where a deviation is nonprejudicial to the one against whom the instruction is given. Thus see, Johnson v. West, Mo., 416 S.W.2d 162, where the omission of the word "either" from paragraph "First" of MAI 17.02 was held not to have been prejudicial. In that opinion it was held that the true test is whether the instruction is substantially correct. See also, generally, Jackson v. Cherokee Drug Co., Mo.App., 434 S.W.2d 257; Aubuchon v. LaPlant, Mo., 435 S.W.2d 648. We hold here that the giving of Instruction No. 2 did not constitute prejudicial error, but we couple this ruling with a distinct warning to counsel *not* to experiment with MAI Instructions in the future, for they may not be so fortunate.

■ As its last point defendant insists that the verdict of $18,000 is still excessive notwithstanding the remittitur. It concedes a $3000 loss of wages and sick leave time which, of course, leaves an award of $15,000 for pain, suffering and the injuries. There was substantial evidence of some permanent disability and limitation of activities. Defendant cites three cases: Moehle v. St. L. P. S. Co., Mo.App., 229 S.W.2d 285; Bowyer v. Te-Co., Inc., Mo., 310 S.W.2d 892 and Baker v. K. C. Term. R. Co., Mo., 250 S.W.2d 999. We have examined these cases. In Moehle a verdict

of $10,000 (rendered prior to 1950) for somewhat similar injuries was reduced by the trial court to $6000. The appellate court declined to reduce it further. When we consider the change in economic conditions in 20 years and the limitations in this plaintiff's activities, the present verdict is not offensive to us by comparison. A consideration of the other two cases cited and of the state of our decisions in general does not convince us that the verdict is so excessive as to require further action by us. The trial court has acted, and under such circumstances the appellate court is generally reluctant to interfere. Bine v. Sterling Drug, Inc., Mo., 422 S.W.2d 623. We conclude that there was and is reasonable and substantial evidence to support the amount of the judgment. That, after all, is the true test. Bone v. Gen. Motors Corp., Mo., 332 S.W.2d 916, 71 A.L.R.2d 361.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.